**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jerry Callicutt, David Gordon, Gentry McQuinston, D'Andre O'Neal, and Craig Poindexter,

Plaintiffs,

v.

The Pepsi Bottling Group, Inc.,

Defendant.

Civil No. 00-95 (DWF/AJB)

**MEMORANDUM OPINION AND ORDER**

---

Jeffrey R. Anderson, Esq., Jodean A. Thronson, Esq., and Patrick W. Noaker, Esq., Reinhart & Anderson, E 1000 First Bank Bldg., 332 Minnesota St., St. Paul, MN 55101 and Lori C. Peterson, Peterson Law Office, 700 Lumber Exchange, 10 5th St. S., Minneapolis, MN 55402, on behalf of Plaintiffs.

Gregory J. Stenmoe, Esq., Scott G. Bowman, Esq., and Tamika R. Nordstrom, Esq., Briggs & Morgan, 2400 IDS Ctr., 80 S. 8th St., Minneapolis, MN 55402, on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on March 1, 2002, pursuant to Defendant's Motion for Summary Judgment. Plaintiffs allege racial discrimination in the form of a racially hostile work environment and retaliation, in violation of 42 U.S.C. §§ 1981(a) and (b), 1981a, and 2000(e), and Minn. Stat. §§ 363.01-.20. Plaintiffs also raise common law claims of intentional infliction of emotional distress, invasion of privacy, and negligence. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

MAY 1 3 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## Background

Plaintiffs are African-American. Plaintiffs worked for Defendant Pepsi Bottling Group, Inc. (hereinafter "Pepsi") as bulk loaders at its Burnsville, Minnesota location. Bulk loaders work in the warehouse loading products onto pallets or trucks, according to daily loading instructions. The Burnsville location employs roughly 560 employees, approximately 10.5% of whom are African-American.

Plaintiff Jerry Callicutt (hereinafter "Callicutt") worked for Pepsi as a bulk loader from July 21, 1999, to January 4, 2001, at which time he was terminated for theft of Pepsi product. Plaintiff Craig Poindexter (hereinafter "Poindexter") worked for Pepsi as a bulk loader from November 9, 1999, to September 21, 2000, when he tendered his resignation.

Plaintiffs Gentry McQuiston (hereinafter "McQuiston"), D'Andre O'Neal (hereinafter "O'Neal") and David Gordon (hereinafter "Gordon") were all temporary employees supplied through ASI temporary staffing agency. McQuiston worked for Pepsi as a bulk loader from July 24, 1999, to March 23, 2000, when he was terminated for a "no-call, no-show." O'Neal began working for Pepsi in April 1999, as a merchandiser. He was moved to the warehouse in June and worked there until Pepsi terminated his employment in August. Gordon worked at Pepsi from August 27, 1999, to October 8, 1999. O'Neal and Gordon were both terminated because they were seasonal employees and no longer needed by Pepsi.

Plaintiffs filed charges with the EEOC and have received right to sue letters. Callicutt and Gordon filed their charges with the EEOC on November 24, 1999; O'Neal filed his charge on December 6, 1999; McQuiston filed his charge on December 15, 1999; and Poindexter filed his charge on January 26, 2000.

**Callicutt**

Callicutt alleges that he applied for a position with Pepsi three times–three weeks in a row–in June 1999. Each of those times, he marked the box on the application identifying himself as an African-American, but did not receive a phone call. He allegedly filled out a fourth application on June 29, 1999, and did not mark the African-American box. Two days later, Pepsi called him for an interview. He was hired as a second shift bulk loader. Neither party has produced copies of the first three application forms.

Callicutt believes that Pepsi hires more Caucasians than African-Americans. As evidence of this, in addition to his application experience, he recalls that on one occasion Pepsi hired seven or eight Caucasian employees, but no African-Americans, although several applied. Callicutt also reports that the bulk loader warehouse was racially segregated because the loaders were divided into racially aligned teams. He states that "blacks train blacks, whites train whites and work crews are of the same race." In response to Callicutt's concerns, Pepsi implemented a new selection process where managers assigned teams, rather than allow the employees to pick teams. Black and white bulk loaders worked on the same teams after the implementation of this policy.

On September 27, 1999, Callicutt maintains that he heard three white co-workers say, "These niggers are messing everything up." Callicutt could not identify the three white co-workers. He immediately reported the incident to Fred Norkeh, a black supervisor, and then to human resources several days later. Norkeh apologized to Callicutt for the incident and promised to look into it. Callicutt reviewed pictures with Sandy Wolslayer from human resources on September 30, 1999, but still could not identify the three white co-workers. The co-workers were never identified.

Two days later, on September 29, 1999, Callicutt heard the word "nigger" as he entered the bathroom. Callicutt did not see who uttered the word, but Gordon, who was just leaving a bathroom

stall, told him it was three white co-workers. Callicutt did not see them because they went out the other bathroom door, and their backs were turned toward him. He again told Norkeh, who took his statement. The white co-workers were never identified.

The next day, September 30, 1999, Callicutt and Gordon were finishing their shift when Dave Carney, a white co-worker, rode by on his forklift and said, "Why don't you niggers clean the leech area?" While Gordon went to find Norkeh, Carney approached Callicutt saying, "Hey, Jerry." When Callicutt refused to answer him, Carney then said "Hey nigger, why don't you and your nigger friend clean up?"

The next day, Callicutt spoke with Bill Pothen, a white supervisor, who apologized to him and told him to speak with Deb Ogston, the senior human resources manager. Callicutt spoke with Ogston on October 4, 1999. Callicutt received several days off with pay after the incidents, while Pepsi conducted an investigation. Pepsi suspended, then terminated Carney over the incident. An arbitrator, however, reinstated him some time later, finding Callicutt's testimony not credible. Callicutt alleges that Ogston told him that if he testified at the arbitration, the guys in the warehouse would "look at [him] funny."

On October 7, 1999, Martin Frary, a white co-worker, told Callicutt, "I'm going to have to teach you black people some manners." Sherman Carter, the assistant human resources manager at Pepsi, who is also black, fired Frary because of this incident.

Callicutt also maintains that Mark Bader, a white co-worker, made offensive comments and attempted to run him over with a forklift on two occasions. Callicutt reported to human resources that Bader told him, "Blacks steal things," "Black people don't know how to build things," "You're a no good lazy bum," and "You're always late, never come into work on time." Pepsi suspended Bader, but then reinstated him with back pay after all witnesses claimed the verbal events were not

true. Nobody else witnessed the attempts to run Callicutt over with the forklift. Callicutt reported the attempts to Wade Johnson, a white supervisor.

Callicutt's employment with Pepsi was terminated on January 4, 2001, for theft of company product.

**Poindexter**

Poindexter received a job offer from Pepsi on November 9, 1999. Almost immediately after he began working, Poindexter learned of race problems in the warehouse from Wolslayer, in orientation, and shortly thereafter, from Callicutt. Poindexter first heard about a pending lawsuit from Johnson, and he describes the work environment as "everyone walking on eggshells."

In his first week on the job, Poindexter reported hearing Tim White, a white co-worker, singing a song called "Almighty Whitey." Poindexter reported it to Norkeh. Norkeh allegedly dismissed his complaint. On a separate occasion, a white co-worker named Greg, said in reference to Poindexter, "Let's put this boy to work now." Poindexter reported the comment to both Johnson and Norkeh. Johnson said he would look into it, but never mentioned it to Poindexter again. In summer 2000, Poindexter alleges that he overheard "nigger" used by a group of white co-workers on a smoke break. He reported what he heard to Norkeh. The co-workers were never identified.

Poindexter describes many incidents of tampering and horseplay at the hands of his co-workers. In one instance, a water balloon landed near him, but he did not see who threw the balloon. Nobody else witnessed the incident, but he noticed Mike Armstrong, Tim Severson, and Joe Kelly, three white co-workers, nearby and pretending to be busy. He stated that these three engaged in this type of horseplay all the time with each other. Poindexter had no idea if the incident had to do with race, but he reported it to Norkeh. On five or six occasions, co-workers also turned off the gas, when he left his forklift running. He had seen this happen to others, so he did not believe

it was race based. Occasionally, Poindexter found stickers on his forklift that read "pick up." Poindexter reported this to Johnson who replied that he should do the same thing in retaliation.

On January 17, 2000, Martin Luther King Jr. Day, Poindexter discovered a donut pinned to the bulletin board in the break room. Poindexter had been in the break room earlier and noticed that only three chocolate donuts were left. He returned later to find the last donut pinned to the bulletin board, decorated like an African-American with pigtails. Somebody had poked different colored pins onto the donut as eyes, and it had a paperclip stuck through its head like an arrow. Another paperclip served as a mouth. Kevin Burkhart, a white co-worker, and Bader were in the break room at the time, although they did not say anything to Poindexter. Poindexter ripped the donut off the wall and threw it in the trash with enough force to attract attention. The next day, Poindexter reported the incident to Carter, who began an investigation and searched for the donut himself, but could not find it. Poindexter also went back to look for the donut the next day, and although the trash had not been emptied, he could not find it. Poindexter found the donut offensive, especially on King's birthday, and assumed a white co-worker had done it. Carter ended his investigation, concluding that the decorated donut was not race-based.

Poindexter resigned from his position at Pepsi on September 15, 2000. Pepsi alleges that he was about to be terminated for absenteeism.

**<u>Gordon</u>**

Gordon worked as a temporary employee through ASI staffing from whom he also received his paychecks. Gordon alleges some of the same discrimination incidents as Callicutt, especially near the end of his employment on October 8, 1999.

Gordon was present for the "bathroom incident" on September 29, 1999. He heard someone singing, "Nigger, nigger, nigger, go home." Although he was in the stall, he knew the singers were

white because he could see through the crack alongside the door. He spoke with Callicutt about the incident the next day, but he did not report it to Pepsi.

Gordon also witnessed the Carney incident on September 30, 1999. Gordon heard Carney say, "Why don't you niggers clean up the leech area?" He reported the incident to Norkeh.

The one incident Gordon experienced alone involved Mike Christensen, the union steward. Christensen told Gordon he was "nothing." This occurred after Christensen found Gordon in a certain section of the warehouse. Gordon is unsure if he reported the incident to Pepsi, although he believes he reported it to ASI. He did not report the incident as race-based.

Gordon was told all temporary employees would be terminated the first week in October. He believes this to be false and alleges that he was retaliated against for the Carney incident.

**McQuiston**

McQuiston also worked at Pepsi through ASI staffing until he was terminated in March 2000, after a "no-call, no-show."

McQuiston worked with a racially diverse group of co-workers as a bulk loader, but he also claims that work crews were racially segregated. He felt Pepsi discriminated against him when it did not hire him as a full-time employee. Although he had passed the required test, five white applicants, who were not working for Pepsi at the time, were hired to fill full-time positions. McQuiston reported his concern to both Pothen and Carter. Pothen assured him that everything would be fine. While McQuiston admits he had no expectation of full-time employment as a temporary employee, he maintains that his qualifications were equal to the white applicants who were hired and that temporary employees were disproportionately black.

McQuiston reports several incidents he attributes to racial bias. Severson and Kelly referred to him as "FUBU" and "Sinbad," on one occasion. "FUBU" is an African-American line of

clothing, which stands for "For Us By Us." While McQuiston often wore a "FUBU" jacket, he believes the reference was motivated by his race. He also found the reference to Sinbad offensive because it is not his name. McQuiston stated that he would find it offensive if someone called him Sean Connery because that is not his name. McQuiston reported this incident to Carter, who reprimanded Severson. The name-calling did not happen again. On another occasion, McQuiston reported that Severson told him he was not black. McQuiston is biracial and admits that he has a light complexion. Pepsi suspended Severson for the incident.

McQuiston also heard Tim Patterson, a white co-worker, make negative racial remarks, but he did not report it to Pepsi. In addition, Frary allegedly told McQuiston that the lawsuit against Pepsi was "bullshit." McQuiston reported this to Carter, who replied that Frary should not be discussing the lawsuit. McQuiston also alleges that he was singled out in the break room for taking too long of a break, while Tim Faith, a white co-worker, was actually sleeping in the break room. McQuiston does not know if Faith was sick or if he had already clocked out for the day. McQuiston also maintains that on December 3, 1999, he experienced racial discrimination when he did not receive a razor to cut wrappings on the product despite their distribution to all other bulk loaders.

Finally, McQuiston maintains that white co-workers impeded his work because they would invoke seniority when selecting trucks or forklifts. He saw white employees kick Callicutt and Poindexter off forklifts as well. McQuiston generally feels that white co-workers were disrespectful to him the whole time he was at Pepsi; however, he does not name individuals in support of this contention.

**O'Neal**

O'Neal began working for Pepsi through ASI in April 1999, but he did not begin in the warehouse until June 1999. He received his paychecks through ASI and understood that he was a seasonal employee.

O'Neal moved to the warehouse after an incident with a customer. During a delivery to a grocery store, a white employee for the store began moving the Pepsi product from where O'Neal had placed it. O'Neal confronted the white employee, and a verbal altercation ensued. Another white employee of the store interceded, called O'Neal's supervisor, and O'Neal's supervisor ultimately asked O'Neal to leave. Pepsi reassigned O'Neal to the warehouse three days later. O'Neal contends that his supervisor "sugarcoated" the incident by telling him that the customer is always right.

O'Neal alleges several incidents that occurred during his three-month employ in the warehouse. O'Neal worked on the loading team to which he was assigned, usually with Gordon and Callicutt, although not with white co-workers. O'Neal alleges that lunch breaks were handled differently for white and black employees, and he contends that blacks were singled out when late or absent. O'Neal was written-up for being late. O'Neal also maintains that white co-workers treated him disrespectfully, although he does not give any names. He thinks that this might have occurred because, almost daily at meetings, he spoke out against perceived slights. O'Neal alleges that white co-workers prevented him from going to certain places in the warehouse, especially near their product. After reporting this to Pothen, O'Neal did not experience this problem again.

At one point, O'Neal was involved in a heated argument with Frary over the use of a forklift. Frary had seniority over O'Neal, but O'Neal contends that the interaction would have been different if he were white. Frary is also alleged to have said that, "This is a white man's world and blacks are

not cut out for the job." Nobody else witnessed this exchange, and O'Neal did not report it to human resources. When he reported the incident to Pothen, O'Neal contends that Pothen "sugarcoated" it.

On another occasion, Tim Faith, a white co-worker, called O'Neal a "nigger" on one occasion. O'Neal reported the incident to Pothen, who told them both that everyone needed to work together. O'Neal alleges that, on a different occasion, Christensen said that temps were not worth "shit." O'Neal admits he may have sworn at Christensen in response. O'Neal concluded that the incident was race-based. O'Neal noticed the word "nigger" written on the bathroom walls at least five times as well. He reported these instances to Pothen, and the wall was consistently painted over by Pepsi.

O'Neal was told Pepsi let him go because it needed to cut back on help. However, O'Neal believes that he was terminated because of his attitude.

## Discussion

### A. Standard of Review

To prevail with its motion for summary judgment, Pepsi must show that "no genuine issue [exists] as to any material fact and that [it] is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986) (quoting Fed. R. Civ. P. 56(c)). Plaintiffs must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). In so doing, Plaintiffs cannot rely on mere allegations or denials. *Celotex*, 477 U.S. at 324.

A material fact affects the resolution of the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A genuine dispute exists if the matter "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Id.* at 250. The court must view the facts and all reasonable inferences drawn from the facts in the

light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).

Summary judgment is not typically appropriate in employment discrimination cases, *Basset v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000), "because such cases often depend on inferences rather than direct evidence." *Bradley v. Widnall*, 232 F.3d 626, 630-31 (8th Cir. 2000). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327; *accord* Fed. R. Civ. P. 1. The bottom line for summary judgment of Title VII claims is whether a reasonable jury could return a verdict in favor of the non-moving party. *Dowd v. United Steelworkers of America, Local No. 286*, 253 F.3d 1093, 1101 (8th Cir. 2001).

**B. Issues**

Plaintiffs allege racial discrimination in the forms of a racially hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, Sections 1981 and 1981a of the Civil Rights Act of 1991, and the Minnesota Human Rights Act (MHRA).[1] Plaintiffs also raise common law claims of intentional infliction of emotional distress, invasion of privacy, and negligence. By its current motion, Pepsi moves for summary judgment on all claims.

---

[1] Although Plaintiffs raise separate MHRA claims, the Court conducts its analysis of these claims pursuant to Title VII case law. *Mems v. City of St. Paul, Dept. of Fire and Safety Services*, 224 F.3d 735, 738 (8th Cir. 2000).

### 1. Employment Status

In order to raise Title VII claims, plaintiffs must qualify as "employees" of Pepsi as defined by the Act. *Wilde v. County of Kandiyohi*, 15 F.3d 103, 104 (8th Cir. 1994). Pepsi contends that Gordon, McQuiston, and O'Neal do not qualify as Pepsi employees because they were temporary employees employed by ASI.

Title VII offers only the axiomatic definition that an "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). In response to this vague declaration, "nearly every appellate court has applied a test described as a hybrid of the common-law test and the economic realities test" to determine whether a party qualifies as an employee under Title VII. *Wilde*, 15 F.3d at 105 (citations omitted).

Under the hybrid test, to determine whether an employer-employee relationship exists, all circumstances surrounding the relationship must be considered. *Id.* at 106. A non-exhaustive list of factors should be taken into account so that the totality of the circumstances may be considered:

> (1) the skill required for the job; (2) the source of the equipment and tools used on the job; (3) the location of the work; (4) the duration of the employment relationship; (5) whether the employer assigns additional projects to the employee; (6) the employee's control over the work schedule; (7) the method of payment; (8) the employee's role in hiring and paying assistants; (9) whether the work is part of the regular business of the employer; (10) whether the employer is in business; (11) how employee benefits are conducted; and (12) the tax treatment of the employee.

*Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 207 F.3d 480, 484 (8th Cir. 2000) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S. Ct. 1344 (1992)). The most important consideration, however, is whether the employer controls the means and manner of the purported employee's work. *Id.*

The parties did not address this issue extensively. Nonetheless, the necessary factors may be gleaned from the record. Several factors weigh against a finding that Gordon, McQuiston, and

O'Neal qualify as employees of Pepsi under Title VII. Plaintiffs were hired through ASI. ASI retained the right to change their work assignment to a different location. It alone retained personnel files on each Plaintiff. ASI also determined Plaintiffs' rate of pay and was solely responsible for issuing paychecks to the Plaintiffs. Finally, the employment relationship between Pepsi and each Plaintiff did not last longer than six months. Indeed, all three Plaintiffs entered the position with the knowledge that they were seasonal employees.

Conversely, several factors weigh in support of a finding that Plaintiffs qualify as employees of Pepsi under Title VII. Most importantly, Pepsi controlled the manner and means by which Plaintiffs went about their work. Plaintiffs were all bulk loaders placed under the direct supervision of Pepsi employees. Pepsi provided forklifts for Plaintiffs to do their jobs. It also set Plaintiffs work schedule and disciplined Plaintiffs if they were late. Pepsi appears to have controlled termination of the employees as well, although it may have been done officially through ASI. All of the work took place in the warehouse at Pepsi's Burnsville location. Plaintiffs' duties as bulk loaders were the same as Pepsi's full-time bulk loaders, such that they all performed the same tasks and worked together on loading teams.

While many of the economic factors weigh against a finding that Gordon, McQuiston, and O'Neal were "employees," all of the factors relating to the work environment-the common law factors-weigh in favor, including Pepsi's control over the manner and means of work performance. This view is consistent with decisions from other jurisdictions regarding temporary employees raising Title VII claims. *See, e.g., Reynolds v. CSX Transp., Inc.*, 115 F.3d 860, 869 n.12 (11th Cir. 1997), *vacated on other grounds*, 524 U.S. 947, 118 S. Ct. 2364 (1998) (noting that temporary employee provided sufficient legal evidence that she qualified as "employee" under Title VII in light of economic realities and common law principles); *Freeman v. Kansas*, 128 F. Supp. 2d 1311, 1316

(D. Kan. 2001) (finding plaintiff qualified as "employee" under Title VII despite factors of hybrid test favoring both parties); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 348-49 (S.D.N.Y. 1984) (finding plaintiff qualified as "employee" under Title VII where employer controlled means and manner of workers' performance). Accordingly, under the totality of the circumstances, the Court finds that Gordon, McQuiston, and O'Neal qualify as "employees" of Pepsi for the purpose of asserting a Title VII claim.

**2. Hostile Work Environment**

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993). Consistent with this congressional intent, discrimination is defined "in the broadest possible terms," not confined to specific acts of discrimination or defined types of illegal activity. *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir. 2000). Consequently, a plaintiff may establish a Title VII hostile work environment claim based on racial discrimination. *Dowd*, 253 F.3d at 1101.

To succeed with their claims, Plaintiffs must make a *prima facie* showing that: (1) they are members of a protected group; (2) they received unwelcome harassment; (3) there is a causal nexus between the harassment and their status as a member of a protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) Pepsi knew or should have known of the harassment and failed to take prompt and remedial action. *Clearwater v. Indep. Sch. Dist.*

*No. 166*, 231 F.3d 1122, 1128 (8th Cir. 2000). The evidence of a racially hostile environment presented by Plaintiffs "must not be compartmentalized, but must instead be based on the totality of the circumstances of the entire hostile work environment." *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 355 (8th Cir. 1997) (citation omitted).[2]

The parties do not dispute that Plaintiffs are members of a protected class or that they were subjected to unwelcome harassment. However, Pepsi does contend that several of the hostile acts were not directed at Plaintiffs because of their race. More significantly, the primary contentions between the parties are whether the harassment was severe or pervasive enough to permeate the work environment and thus affect a term or condition of employment and whether Pepsi knew or ought to have known of the discriminatory conduct and failed to take appropriate remedial action. Pepsi argues that Plaintiffs rely largely on isolated incidents, involving unidentified perpetrators, that often went unreported to human resources. Pepsi further contends that, on the occasions Plaintiffs did report incidents to supervisors or human resources, it took prompt and remedial action to end the discriminatory conduct. Plaintiffs argue that they each produced evidence of direct racial slurs and harassing behavior that they experienced throughout their employment with Pepsi. Plaintiffs

---

[2] The Court rejects Pepsi's argument that incidents involving a racially hostile work environment occurring in 1998 are not relevant in the case at bar. The Court agrees that Plaintiffs cannot maintain a claim arising solely on hearsay evidence, or events occurring prior to their employment. However, under the totality of the circumstances, Plaintiffs' awareness of racially discriminatory incidents experienced by others at Pepsi may be relevant as to whether Pepsi maintains a racially hostile work environment. *Madison v. IBP, Inc.*, 257 F.3d 780, 793 (8th Cir. 2001), *rehearing and rehearing en banc denied* (8th Cir. Sept. 21, 2001). For example, if Pepsi instituted a mandatory diversity and sensitivity training policy in 1998, such evidence of other incidents may serve to determine whether the policy was adequate. *Id.* However, the Court views evidence relating to events in 1998 for the limited purpose of providing context evidence that, without more, cannot serve as the basis for the current claims.

additionally contend that of the core nineteen incidents reported, Pepsi only took action two times, and in any event, the action taken was ineffective.

**a. Protected Class**

Plaintiffs must first show that the hostile acts directed at them were because of their membership in a protected class. Plaintiffs are entitled to work in an environment free from racially motivated "intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21-22, 114. S. Ct. at 367. Racial epithets often serve as the basis for racial harassment claims and may create an inference that racial animus motivated seemingly innocent conduct as well. *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999) (citing *White v. Honeywell, Inc.*, 141 F.3d 1270, 1273, 1276 (8th Cir. 1998)). Accordingly, not "all instances of harassment [must] be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Id.*

Without question, the racial epithets of "nigger," "blacks," or "boy," qualify as discriminatory comments based on race. Likewise, when viewed in conjunction with blatant, racially motivated incidents, epithets of "nothing," "FUBU," and "Sinbad," may also be determined to have been motivated by a racial animus. It stands to reason that if the same white co-workers who used racial slurs were kicking Plaintiffs off forklifts, playing pranks on them, and singling them out in the break room, these arguably benign occurrences may be found to stem from a racial animus as well. Consequently, the Court finds that a reasonable jury could conclude that Plaintiffs each experienced unwanted harassment directed at them because of their race.

**b. Severe and Pervasive**

Having established that the discriminatory harassment was because of their race, it is well settled that Plaintiffs must show that the workplace was permeated with "discriminatory

intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the [their] employment and create[d] an abusive working environment." *Bradley*, 232 F.3d at 631 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)). In order to alter a term or condition of Plaintiffs' employment, the offensive environment must satisfy both a subjective and objective test; it must be hostile and abusive to the reasonable person, and Plaintiffs had to perceive it as such. *Carter*, 173 F.3d at 701-02. Factors to consider when determining whether discriminatory activity "is sufficiently severe or pervasive include: [(1)] 'the frequency of the discriminatory conduct; [(2)] its severity; [(3)] whether it is physically threatening or humiliating, or a mere offensive utterance; and [(4)] whether it unreasonably interferes with an employee's work performance.'" *Bradley*, 232 F.3d at 631.

Although a close case, the Court finds that a reasonable jury could conclude that Plaintiffs Callicutt, Gordon, O'Neal and Poindexter were subjected to a racially hostile work environment that was severe and pervasive enough to affect a term or condition of their employment. Callicutt and Gordon each reported multiple instances of "nigger" being used, both directed at them and generally used in everyday work banter.[3] Co-workers told Callicutt that "blacks" were lazy and stole things, and should be taught some manners. Callicutt also reported separate instances of physical harassment in the form of a white co-worker attempting to run him over with a forklift. Gordon, meanwhile, reported an earlier encounter with his union steward, who told him he was "nothing," and then was subsequently terminated a week after the Carney incident.

---

[3] Pepsi contends that Callicutt and Gordon are precluded from raising the Carney incident because an arbitrator found their story not credible. The Court disagrees. Whether Carney's termination was appropriate or not, Pepsi had other alternatives to addressing the incident, and the incident, at a minimum, serves as context evidence for issues such as Pepsi's knowledge of alleged discriminatory behavior in the workplace and whether its response to such behavior was adequate. Such issues remain questions of fact to be determined by a jury.

O'Neal reported an incident where a white co-worker called him a "nigger." He also reported seeing "nigger" written on the bathroom walls on multiple occasions. Additionally, he experienced situations where his union steward told him he was not worth "shit," had arguments over forklifts, and allegedly was singled out on breaks. Poindexter reported several instances of verbal abuse as well. He heard white co-workers sing a song called "Almighty Whitey," refer to him as "boy," and freely use "nigger" during a smoke break. Poindexter also experienced multiple instances of physical harassment in the forms of unwanted pranks and practical jokes, which, coupled with the other evidence of racially hostile acts, could be seen as racially motivated. Finally, Poindexter took extreme offense from the donut incident on Martin Luther King Jr. Day as well.[4] While many of these incidents could very well have been non-racially motivated, a reasonable jury could find, under the totality of the circumstances, that such incidents were racially motivated and attempts to intimidate or threaten African-American employees.

The Court agrees with Pepsi that the facts of this case are not as egregious as those in *Carter*, where the Eighth Circuit reversed a ruling of summary judgment. In *Carter*, the plaintiff "produced evidence that she experienced a host of indignities over the course of some two years," including verbal abuse, sexual gestures, and even dead animals. *Carter*, 173 F.3d at 702. Nor does the hostility and abuse here rise to the level of the pervasiveness found in *Delph*, where the plaintiff was subjected to nearly two years of racial epithets from his supervisor, including "nigger," "black boy," and references to the plaintiff's wife as "whitey." *Delph*, 130 F.3d at 393. However, several of the

---

[4] Pepsi argues that Plaintiffs Callicutt, Gordon, McQuiston, and O'Neal "are prohibited from presenting evidence of the alleged . . . 'donut incident' or any other alleged events occurring" after they filed their respective EEOC complaints because the complaints were not amended to include these incidents. (Pepsi Sum. J. Memo at 29.) The Court finds this argument to be moot concerning the issue at hand because only Poindexter relies on the "donut incident," an incident which he witnessed directly.

incidents of which both Callicutt and Gordon complain occurred within a concentrated four-day period. *See, e.g., Ross v. Douglas County, Nebraska*, 234 F.3d 391, 397 (8th Cir. 2000) (finding that Plaintiff's claim not defeated by alleging only few specific incidents of racial harassment); *Ways v. City of Lincoln*, 871 F.2d 750, 755 (8th Cir. 1989) (upholding racially hostile work environment claim where only few incidents of racial slurs listed). O'Neal reported hearing or seeing racial epithets on only a few occasions, but he also experienced other incidents which may have been motivated by racial animus. These incidents occurred over the entire time he worked in the warehouse. Poindexter reported incidents ranging from when he first began working at Pepsi in late fall through the following summer. None of these Plaintiffs were employed for more than two years. Indeed, O'Neal and Gordon were only at Pepsi for three months. Within a shorter time frame, such as the tenure of some of the instant Plaintiffs, even a few instances of the use of "nigger" may be found to be severe and pervasive. The Court thus finds that a reasonable jury could find that the racial hostility experienced by Callicutt, Poindexter, Gordon, and O'Neal, was severe and pervasive enough to affect a term or condition of their employment.

In contrast, the Court finds that, as a matter of law, McQuiston fails to make the required showing of severe and pervasive hostility. McQuiston alleged that he was not hired full-time because of his race, but supported this contention with nothing more than his own perception. He was called "FUBU" or "Sinbad" on only two occasions. While the Court recognizes that McQuiston may have been rightfully offended by this and that the behavior of McQuiston's co-workers was wholly inappropriate, the Court does not find that a reasonable juror could find such conduct to constitute severe harassment. Finally, McQuiston offered other incidents that fail to demonstrate severe or pervasive racial harassment in and of themselves, or in combination. He, like some of his fellow Plaintiffs, alleged that white co-workers invoked seniority over him, but he makes no showing

that this was race based conduct. He felt he was singled out on lunch breaks, but even if true, he only reports one instance. The Court does not doubt the sincerity of McQuiston's subjective beliefs. However, the Court finds that he has not succeeded in demonstrating that, as an objective matter, racial discrimination, intimidation, and ridicule permeated his workplace, so as to constitute severe and pervasive conduct under Title VII.

**c. Remedial Response**

Because the alleged racial harassment occurred at the hands of co-workers rather than supervisors, the remaining Plaintiffs must show that Pepsi knew or ought to have known of the racial harassment and failed to take prompt and remedial action. *Carter*, 173 F.3d at 702. "When assessing the reasonableness of an employer's remedial actions, the court may consider the amount of time that elapsed between the notice of the harassment and the remedial measures taken, including any disciplinary action against the harasser or other options available to the employer such as employee training sessions." *Robinson v. Valmont Indus.*, 238 F.3d 1045, 1047 (8th Cir. 2001) (citation omitted). "The promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." *Carter*, 173 F.3d at 702 (citation omitted).

At the outset, the Court recognizes that Pepsi responded to some of the reported incidents. It terminated Carney and Frary and suspended Bader and Severson. In addition, Pothen talked to O'Neal and Faith, and told them that everyone needed to work together. Pepsi also investigated the donut incident and had Callicutt look through an employee photo list in an effort to identify who had said "nigger" in the break room. It painted over the bathroom walls when "nigger" was found written in black marker. Pepsi also responded to Plaintiffs concerns that the workplace was segregated by implementing a new bulk loader team selection process where the supervisors assigned the teams, a process which Plaintiffs admit corrected the problem. Pepsi hired Sherman

Carter, an African-American, as a senior human resources employee in charge of investigating and responding to claims of racial harassment in the workplace. Since 1998, Pepsi mandated diversity and sensitivity training for all employees. Of the incidents Pepsi did not investigate, some were incidents where no perpetrator was identified, were horseplay or purported invocations of seniority, or were unreported.

The Court agrees that Pepsi took remedial action on some of the incidents reported to it, especially those involving the most offensive racial epithets. However, the Court finds that whether Pepsi's remedial actions were adequate, given the totality of the circumstances, remains a question for the jury. While Pepsi's response could be deemed adequate, the Court finds that the nature of its responses and the continued occurrence of incidents prompting complaints could lead a reasonable jury to conclude that Pepsi should have done more.

Consequently, the Court finds that Callicutt, Poindexter, Gordon, and O'Neal have succeeded in making a *prima facie* showing of a racially hostile work environment. Although a close case, the Court finds that a reasonable jury could find in favor of Plaintiffs, and accordingly, the Court declines to issue summary judgment in favor of Defendant with respect to four of the five Plaintiffs.

**3. Retaliation**

"The MHRA, reflecting the language of Title VII, makes it illegal for an employer to retaliate against an employee who opposes an unlawful employment practice." *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1173 (8th Cir. 2001) (citing Minn. Stat. § 363.03, subd. 7 (2000)). To establish a *prima facie* case of racially discriminatory retaliation under Title VII and the MHRA, Plaintiffs must show that: (1) [they] filed a charge of racial harassment; (2) subsequent adverse action by [Pepsi]; and (3) the adverse action was causally linked to the protected activity. *Ross*, 234 F.3d at 395.

The Court finds that Plaintiffs do not make a *prima facie* showing of retaliation. Gordon and O'Neal did not file their EEOC complaints until they were no longer working at Pepsi. Gordon filed nearly two months after he was terminated, and O'Neal filed his charge over three months after he was terminated. Both therefore fail to meet the second element of subsequent action. Callicutt, Poindexter and McQuiston all filed their EEOC charges while they were working, but all fail to meet the third element by establishing a causal link between the filing of the charge and their respective terminations, or any other alleged adverse action. Callicutt was not terminated for over a year after filing his charge, and he does not refute Pepsi's explanation that he was terminated for theft of company product. Poindexter remained at Pepsi for another eight months after he filed his claim, and then resigned. He does not make a claim of constructive discharge nor does he allege any alternative adverse action which might be causally connected to his EEOC charge. Finally, McQuiston was terminated three months after he filed his EEOC charge for a "no call, no show." He does not dispute that this was a legitimate reason for termination, and, in fact, admits that he had a history of tardiness and absenteeism.

To the extent that Plaintiffs allege their protected activity is one or all of the various reports made to Pepsi personnel; Plaintiffs have also failed to show that any of the alleged discrimination following such reports, or any other alleged adverse action, was somehow related to their complaints. Plaintiffs have made no allegations that the alleged activity worsened following their reports. To the extent that Gordon alleges that his termination was in retaliation for his involvement in the Carney incident, Gordon has offered nothing more than a conclusory allegation. The Court finds that, as a matter of law, Plaintiff has failed to raise a genuine issue of material fact. Indeed, Plaintiffs failed to brief the retaliation issue, and only stated orally that they did not wish to drop this claim. Because none of the Plaintiffs offer any evidence of a causal link between the filing of their

respective EEOC complaints, or their reports to Pepsi personnel, and the eventual terminations, Plaintiffs' claims of retaliation must fail.

**4. Common Law Claims**

Plaintiffs raise common law claims of intentional infliction of emotional distress, invasion of privacy, and negligence. Pepsi argues that the MHRA's exclusivity of remedies provision, Minn. Stat. § 363.11, preempts Plaintiffs from raising these claims. Plaintiffs agree that the MHRA preempts their common law claims, but contend that their common law claims survive, in the alternative, if the Court grants summary judgment on the MHRA claims. Plaintiffs, however, cite no authority for this contention and essentially support it with nothing more than a conclusory sentence. This Court acknowledges the nebulous state of the case law surrounding this issue, but it agrees "that the MHRA preempts a common law cause of action if: (1) the factual basis and injuries supporting the common law claim also would establish a violation of the MHRA; and (2) the obligations the defendant owes to the plaintiff, as a practical matter, are the same under both the common law and MHRA." *Pierce v. Rainbow Foods Group, Inc.*, 158 F. Supp. 2d 969, 975-76 (D. Minn. 2001). Plaintiffs rely upon the same incidents of racial harassment for their common law claims as for their MHRA claims. Although the elements for Plaintiffs' common law claims vary, the Court finds that the same incidents of racial harassment in the workplace would serve to support both the common law claims and the MHRA claims. Accordingly, the current Plaintiffs' common law claims, as pleaded, are preempted by their corresponding statutory claims.

For the foregoing reasons, **IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Summary Judgment (Doc. No. 26) is **GRANTED** in part, and **DENIED** in part such that:

a. The Court denies Defendant's Motion for Summary Judgment with respect to the claims of racially hostile work environment, with respect to Plaintiffs Callicutt, Poindexter, Gordon, and O'Neal. The Court grants Pepsi's motion for summary judgment in all other respects;

b. Plaintiff McQuiston's statutory claims, Counts I, II, and III are **DISMISSED WITH PREJUDICE**; however, Counts I, II, and III remain standing with respect to Plaintiffs Calicutt, Gordon, O'Neal, and Poindexter; and

c. Plaintiffs Calicutt, Gordon, McQuiston, O'Neal, and Poindexter's common law claims, Counts IV, V, and VI, of intentional infliction of emotional distress, invasion of privacy, and negligence are **DISMISSED WITH PREJUDICE**.

Date: May 13, 2002

DONOVAN W. FRANK
Judge of United States District Court